**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA ("PhRMA"),<br><br>            Plaintiff,<br><br>v.<br><br>Federal Trade Commission ("FTC"),<br><br>            Defendant. | Case No. 13-cv-1974 (BAH) |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW PLAINTIFF Pharmaceutical Research and Manufacturers of America ("PhRMA") and respectfully moves this Honorable Court to enter summary judgment pursuant to Fed. R. Civ. P. 56 for Plaintiff on all claims.  Pursuant to Local Rule 7(a) and (h)(2), this motion is supported by the accompanying Memorandum of Points and Authorities and the Statement of Facts therein, as well as Exhibits A–F.  Pursuant to Local Rule 7(f) and the Court's Standing Order 5(b), Plaintiff hereby requests a hearing on this motion, should the Court deem it helpful for resolution of this case.

Dated: February 7, 2014

<div style="margin-left:40%">

Joseph A. Ostoyich, DC Bar # 436157
joseph.ostoyich@bakerbotts.com
James F. Rill, DC Bar # 52027
james.rill@bakerbotts.com
Wm. Bradford Reynolds, DC Bar # 179010
bradford.reynolds@bakerbotts.com
David Shotlander, DC Bar #975011
david.shotlander@bakerbotts.com
Emma M. Burnham, DC Bar # 1012126
emma.burnham@bakerbotts.com
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., NW
Washington, DC 20004-2400
*Attorneys for Plaintiff*

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA ("PhRMA"),<br><br>Plaintiff,<br><br>v.<br><br>Federal Trade Commission ("FTC"),<br><br>Defendant. | Case No. 13-cv-1974 (BAH) |

<u>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

Dated: February 7, 2014

Joseph A. Ostoyich, DC Bar # 436157
joseph.ostoyich@bakerbotts.com
James F. Rill, DC Bar # 52027
james.rill@bakerbotts.com
Wm. Bradford Reynolds, DC Bar # 179010
bradford.reynolds@bakerbotts.com
David Shotlander, DC Bar #975011
david.shotlander@bakerbotts.com
Emma M. Burnham, DC Bar # 1012126
emma.burnham@bakerbotts.com
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., NW
Washington, DC 20004-2400

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page No.**

INTRODUCTION................................................................................................i

STATEMENT OF FACTS ............................................................................ 2

I.      The HSR Act.........................................................................................2

II.     The Rulemaking ..................................................................................5

III.    The Impact of the Rule .....................................................................10

IV.     Plaintiff's Challenge..........................................................................13

STANDARD OF REVIEW ......................................................................... 14

ARGUMENT ................................................................................................ 16

I.      The Rule Exceeds the Scope of the FTC's Delegated Authority under
        the HSR Act.......................................................................................16

II.     The Rulemaking Was Arbitrary and Capricious. ........................23

        A.      The Rule Was Not the Product of Reasoned Decisionmaking.........................23

        B.      The FTC's Explanation Is Contrary to the Only Record
                Evidence...........................................................................24

        C.      The Commission Failed to Respond to the Rulemaking's
                "Substantial Problem" PhRMA Raised in its Comments. ...............................25

        D.      The FTC Did Not Explain Why a Targeted Rule Is Necessary. .......................28

III.    The Rulemaking Was "Without Observance of Procedure Required
        by Law."............................................................................29

        CONCLUSION ...................................................................... 31

# TABLE OF AUTHORITIES

**Page No.**

**CASES**

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
719 F. Supp. 2d 26 (D.D.C. 2010)..........................................................................14

*Alliance for Natural Health U.S. v. Sebelius*,
775 F. Supp. 2d 114 (D.D.C. 2011).........................................................................2

*\*Am. Bankers Ass'n v. SEC*,
804 F.2d 739 (D.C. Cir. 1995)................................................................................19

*Am. Civil Liberties Union v. FCC*,
823 F.2d 1554 (D.C. Cir. 1987)..............................................................................19

*Am. Equity Invest. Life Ins. Co. v. SEC*,
613 F.3d 166 (D.C. Cir. 2010).........................................................................24, 27

*Am. Library Ass'n v. FCC*,
406 F.3d 689 (D.C. Cir. 2005)................................................................................21

*Am. Mining Cong. v. EPA*,
907 F.2d 1179 (D.C. Cir. 1990)..............................................................................24

*\*Am. Petroleum Instit. v. EPA*,
684 F.3d 1342 (D.C. Cir. 2012)..............................................................................15

*Am. Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008)................................................................................30

*Ass'n of Private Sector Colleges and Universities v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012)................................................................................14

*Bilski v. Kappos*,
130 S. Ct. 3218 (2010)............................................................................................21

*\*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011)..............................................................................25

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)................................................................................................14

*Coburn v. McHugh*,
679 F.3d 924 (D.C. Cir. 2012)................................................................................23

*Comcast v. FCC,*
  600 F.3d 642 (D.C. Cir. 2010) ...................................................................................19

*Deppenbrook v. PBGC,*
  950 F. Supp. 2d 68 (D.D.C. 2013) ...............................................................................2

*Elec. Power Supply Ass'n v. FERC,*
  391 F.3d 1255 (D.C. Cir. 2004) ...................................................................................18

*Forsyth Mem'l Hosp., Inc. v. Sebelius,*
  639 F.3d 534 (D.C. Cir. 2011) .....................................................................................14

*Fox v. Clinton,*
  684 F.3d 67 (D.C. Cir. 2012) .......................................................................................15

*Fund for Animals v. Babbitt,*
  903 F.Supp. 96 (D.D.C. 1995) .....................................................................................14

*ICI v. CFTC,*
  891 F. Supp. 2d 162 (D.D.C. 2013) .............................................................................14

*Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n,*
  887 F.Supp.2d 259 (D.D.C. 2012) ...............................................................................15

*\*La. Fed. Land Bank Ass'n v. Farm Credit Admin.,*
  336 F.3d 1075 (D.C. Cir. 2003) ...................................................................................26

*Manin v. Nat'l Transp. Safety Bd.,*
  627 F.3d 1239 (D.C. Cir. 2011) ...................................................................................15

*Marshall County Healthcare Auth. v. Shalala,*
  988 F.3d 1221 (D.C. Cir. 1993) ...................................................................................14

*Morall v. Drug Enforcement Admin.,*
  412 F.3d 165 (D.C. Cir. 2005) .....................................................................................29

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...........................................................................................23, 24, 27

*Nat'l Ass'n of Clean Air Agencies v. EPA,*
  489 F.3d 1221 (D.C. Cir. 2007) ...................................................................................15

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.,*
  116 F.3d 520 (D.C. Cir. 1997) (per curiam) ...............................................................30

*\*PSEG Energy Res. & Trade LLC v. FERC,*
  665 F.3d 203 (D.C. Cir. 2011) .....................................................................................26

*Richards v. INS*,
554 F.2d 1173 (D.C. Cir. 1977) ...........................................................................14

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .................................................................................................15

*\*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
437 F.3d 75 (D.C. Cir. 2006) ..........................................................................15, 24

*Verizon v. FCC*,
No. 11-1355, __ F.3d __, 2014 WL 113946 (D.C. Cir. Jan. 14, 2014) .............19, 23

*Whitman v. American Trucking Ass'n, Inc.*,
531 U.S 457 (2001) ...........................................................................................20, 21

**STATUTES**

5 U.S.C. § 553 .............................................................................................. *passim*

5 U.S.C. § 706 .............................................................................................. *passim*

15 U.S.C. § 18a .............................................................................................. *passim*

28 U.S.C. § 2201 .......................................................................................................13

28 U.S.C. § 2412 .......................................................................................................13

**OTHER AUTHORITIES**

16 C.F.R. § 801 .....................................................................................................5, 20

16 C.F.R. § 802 .......................................................................................................3, 5

16 C.F.R. § 803 .............................................................................................................5

52 FED. REG. 20059 ...................................................................................................22

77 FED. REG. 50057 (Exhibit A) .......................................................................... *passim*

78 FED. REG. 68705 (Exhibit D) .......................................................................... *passim*

79 FED. REG. 3814 .................................................................................................3, 11

122 CONG. REC. 29342 (Sept. 8, 1976)...............................................................4, 17

122 CONG. REC. 30877 (Sept. 16, 1976)............................................................4, 18

H. Rep., No. 94-1373 ..............................................................................................3, 22

S. 1284 (May 6, 1976) ...................................................................................................4, 17, 18

Local Civil Rule 7(h)(2)..................................................................................................2

Fed. R. Civ. P. 56 .........................................................................................................2

437:16 C.F.R. § 801, Summaries of Communications, *available at*
http://www.ftc.gov/policy/public-comments/initiative-437 (Exhibit C) ..................................8

Comments of PhRMA on Notice of Proposed Rulemaking Regarding Certain Licensing
Transactions in Pharmaceutical Industry (Oct. 25, 2012) (Exhibit B) ........................... *passim*

FTC Bureau of Competition Director Debbie Feinstein, "Un-consummated merger" (Dec.
18, 2013), *available at* www.ftc.gov/news-events/blogs/competition-
matters/2013/12/un-consummated-merger ................................................................................9

FTC Commissioner J. Thomas Rosch, "Consummated Merger Challenges – The Past is
Never Dead" at 2 (March 29, 2012), *available at* http://www.ftc.gov/public-
statements/2012/03/consummated-merger-challenges-past-never-dead ...........................9, 10

Hart-Scott-Rodino Annual Report, Fiscal Year 2012, at 6, *available at*
http://www.ftc.gov/sites/default/files/documents/ ...........................................................12, 13

PNO HSR Filing Fee Information, *available at* www.ftc.gov/enforcement/premerger-
notification-program/filing-fee-information. ........................................................................11

**INTRODUCTION**

This lawsuit challenges an agency's unauthorized assumption of authority that Congress elected to retain for itself and specifically refused to cede to the agency.  The Federal Trade Commission ("FTC" or "Commission") has issued a regulation that makes a significant change to the longstanding rules governing federal antitrust review of mergers and acquisitions by imposing new burdens on a disfavored industry that it inexplicably refrains from imposing on all other industries.  That regulation (hereinafter the "Rule") creates new notification requirements under the Hart Scott Rodino Antitrust Improvements Act, 15 U.S.C. § 18a ("HSR Act") for certain types of patent licenses *only* if used by the pharmaceutical industry, but requires no comparable notification for the same patent licenses if used in other industries.[1]  The Rule exceeds the FTC's authority under the HSR Act, which by its plain language commands the Commission to exercise its rulemaking authority even-handedly as to transactions deemed potentially anticompetitive so that notification burdens are imposed in like fashion for like transactions across all industries.  The Act's legislative history removes any doubt that Congress knowingly and intentionally withheld from the Commission the authority to promulgate rules targeting particular industries.  The challenged Rule does just that, and is therefore unauthorized agency action that cannot be allowed to stand.

The Rule must also be set aside because the FTC failed to provide an adequate basis and explanation for its decision, in violation of the Administrative Procedure Act ("APA").  5 U.S.C. §§ 553, 706.  The Commission provided no reasoned basis for creating new intellectual property licensing standards that are applied depending on nothing more than the industry in which they are implemented.  No facts, no credible evidence, and no empirically based analysis were

---

[1] Final Rule, Premerger Notification; Reporting and Waiting Period Requirements, 78 FED. REG. 68705 (Nov. 14, 2013) ("the Rule") (Exh. D at 1).

introduced to support the Rule or indicate that the Rule was needed in the pharmaceutical sector alone. The Commission offered nothing of substance to rebut the only record evidence—evidence that contradicted the FTC's self-serving explanation for the Rule's selective treatment and confirmed that like transactions were just as prevalent and likely to be used in other industries. Finally, the FTC violated the APA's separate requirement that an agency conducting a notice-and-comment rulemaking must, in order to afford interested parties a meaningful opportunity to comment, include in the rulemaking record a fully reasoned factual basis for its decision. 5 U.S.C. §§ 553(c), 706(2)(D).

Because the Rule exceeds the FTC's authority under the HSR Act and the rulemaking on which it rests violated the APA, the Rule is unlawful and must be set aside under Fed. R. Civ. P. 56.

## STATEMENT OF FACTS[2]

### I.  The HSR Act

Congress enacted the HSR Act to assist the FTC and Justice Department ("antitrust agencies") in preventing anticompetitive mergers or acquisitions, and specifically to "give[] the

---

[2] Because this case involves judicial review of final agency action, in accordance with Local Civil Rule 7(h)(2), PhRMA is not submitting a statement of undisputed material facts, and is instead submitting this Statement of Facts. *See, e.g.*, *Deppenbrook v. PBGC*, 950 F. Supp. 2d 68, 71 (D.D.C. 2013) (Howell, J.) ("Neither the plaintiffs nor PBGC filed separate statements of undisputed fact. Rather, as required by Local Civil Rule 7(h)(2), the PBGC incorporated its statement of facts into its initial memorandum, and included citations to the administrative record."); *Alliance for Natural Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 118 (D.D.C. 2011) (Howell, J.) (observing that Local Civil Rule 7(h)(2) instructs that "the parties are not required to submit statements of disputed or undisputed material facts" in cases involving review of final agency action). The Statement of Facts is derived from the documents composing the administrative record, which contains only the documents attached to PhRMA's complaint and the other comments submitted during the notice-and-comment period. *See* Joint Motion Requesting a Briefing Schedule for Dispositive Motions [Dkt. 11]. Rather than citing to the administrative record, which pursuant to the scheduling order entered on February 3, 2014, has not been filed, the Statement of Facts cites to the documents that compose the administrative record, which are attached as exhibits hereto.

government antitrust agencies a fair and reasonable opportunity to detect and investigate large mergers of questionable legality before they are consummated."  H. Rep., No. 94-1373 (cited in Exh. B-6 n.23 (Comments of PhRMA on Notice of Proposed Rulemaking Regarding Certain Licensing Transactions in Pharmaceutical Industry (Oct. 25, 2012)) at 5.  Congress believed that this review was necessary to allow the antitrust agencies a "meaningful chance to win a premerger injunction—which is often the only effective and realistic remedy against large, illegal mergers." *Id.*  The Act was aimed at mergers in which "[t]he independent identity of the acquired firm disappears" because Congress was concerned that, under that narrow circumstance, "restoring the acquired firm to its former status as an independent competitor is difficult at best, and frequently impossible." *Id.* at 8.  The HSR Act thus established the federal pre-merger notification program, requiring parties proposing certain merger or acquisition transactions to submit pre-merger filings to both of the antitrust agencies for review, and prohibiting consummation of the proposed transaction during a statutory waiting period while that review is ongoing.  *See* 15 U.S.C. § 18a (2012).  The agencies may extend the time during which the parties are prohibited from closing their merger or acquisition by requesting additional information, known as a "second request," which is burdensome, time-consuming, and expensive.

By its terms, the HSR Act applies to every "person" who participates in a merger or acquisition that meets the Act's threshold requirements unless the Act or the FTC's exemption regulations state otherwise.  15 U.S.C. § 18a; 16 C.F.R. § 802.  Most mergers and acquisitions valued at more than $75.9 million (subject to annual adjustment, 15 U.S.C. § 18a(a)(2)) must be reported under the Act.  *See* 2014 Revised Jurisdictional Thresholds For Section 7A of the Clayton Act, 79 Fed. Reg. 3814 (thresholds effective February 24, 2014).

During deliberations on the Act, and prior to its passage, the House flatly rejected a bill introduced in the Senate that included a provision that would have allowed the FTC, after consulting with the Justice Department, to selectively "require pre-merger notifications from particular companies or industries or from any class or category of persons."  122 CONG. REC. 29342 (Sept. 8, 1976) (referring to S. 1284 (May 6, 1976)), cited in Exh. B-3 & n.3.  The Senate bill's proposed language would have authorized the antitrust agencies to promulgate rules requiring only some "classes or categories" of persons to file pre-merger notifications on transactions for which all other persons were not required to file.  *See* S. 1284 (May 6, 1976) (cited in Exh. B-3 & n.3).  When the Senate bill arrived in the House, this provision was deleted—and it did not find its way back into the conference bill that became the HSR Act. House Judiciary Committee Chairman Peter W. Rodino explained the decision to delete the provision in the following terms: "In the view of the House conferees, *the coverage of this bill should be decided by Congress—not the FTC and the Justice Department*."  *See* 122 CONG. REC. 30877 (Sept. 16, 1976) (emphasis added) (cited in Exh. B-3 & n.3).

The HSR Act thus limits the FTC's rulemaking authority to four discrete areas—none of which is applicable here.  First, the FTC is tasked with ensuring that required notifications are "in such form and contain such documentary material and information" as is "necessary and appropriate" to enable the antitrust agencies to determine whether the proposed acquisition may, if consummated, violate the antitrust laws.  15 U.S.C. § 18a(d).  Additionally, the Act permits, but does not require, the FTC to promulgate rules that "(A) define the terms used in this section; (B) exempt, from the requirements of this section, classes of persons, acquisitions, transfers, or transactions which are not likely to violate the antitrust laws; and (C) prescribe such other rules as may be necessary and appropriate to carry out the purposes of this section."  15 U.S.C.

4

§ 18a(d)(2); s*ee also* 16 C.F.R. §§ 801–803.  In all of these respects, the Act requires the FTC to follow the APA's notice-and-comment procedures set forth in 5 U.S.C. § 553.

## II.      The Rulemaking

On August 20 2012, the FTC published a "Notice of Proposed Rulemaking Regarding Certain Licensing Transactions in the Pharmaceutical Industry" ("NPR").  Exh. A-1 (77 FED. REG. 50057 (Aug. 20, 2012)).  The NPR proposed fundamental changes to the HSR Act pre-merger notification requirements that would, for the first time in the Act's 37–year history, single out and burden one industry alone with additional notification requirements for patent license transactions previously not regarded by the antitrust agencies as potentially anticompetitive enough to warrant any pre-closing review whatsoever.  To implement this added, selective coverage, the Commission proposed amending 16 C.F.R. § 801.1 to define three terms not included in the HSR Act: "all commercially significant rights," "limited manufacturing rights," and "co-rights."  It further proposed amending § 801.2 (the coverage rules for "acquiring and acquired persons") to extend the HSR Act's coverage to transfers of certain patent rights, but *only* when those transfers occur in the pharmaceutical industry, leaving uncovered the same transactions occurring elsewhere.  Specifically, the proposed Rule stated (Exh. A-5):

> (1) This paragraph applies only to patents covering products whose manufacture and sale would generate revenues in NAICS Industry Group 3254 [the pharmaceutical industry]; (2) The transfer of patent rights covered by this paragraph constitutes an asset acquisition; and (3) Patent rights are transferred if and only if all commercially significant rights to a patent, as defined [by the proposed Rule], for any therapeutic area (or specific indication within a therapeutic area) are transferred to another entity.  All commercially significant rights are transferred even if the patent holder retains limited manufacturing rights, as defined [by the proposed Rule], or co-rights, as defined [by the proposed Rule].

The NPR recognized, as cannot be disputed, that the types of patent licenses covered by the proposed Rule appear in other industries.  *See* Exh. A-3 (advising that "[p]arties dealing with

exclusive rights to a patent in other industries should consult PNO [Premerger Notification Office] staff"). Nonetheless, it represented that these types of license agreements in the pharmaceutical industry were, "*in the PNO's experience*, unlike that seen in any other industry." *Id.* (emphasis added).  There was no explanation of exactly what that alleged "experience" was, how it may have been derived, or why that "experience" indicated that exclusive pharmaceutical license agreements differed from those used in other industries, let alone what may have been the extent or antitrust significance of those alleged differences.  The Commission shared only that it perceived there to be "unique incentives for the use of exclusive licenses" in the pharmaceutical industry, even though it admitted to having no prior dealings whatsoever with these very types of licensing agreements (in the pharmaceutical industry or otherwise) because they had never been reportable under PNO guidance.  *Id.*; *see also* Answer ¶¶ 2, 52.  By its own account, the agency's best and only information appears to have come from an unknown number of unidentified "practitioners" purportedly seeking informal guidance from the PNO on "exclusive licenses in the pharmaceutical industry."  Exh. A-3.  Yet the Commission neither quantified nor described these alleged requests for informal guidance, and the record divulges nothing about their volume, frequency, content, or sources.  Were there three requests or three hundred?  When were they made?  What precise guidance, if any, did they seek?  What was the nature and size—not to mention the identity—of the companies represented?  What answers or other information did the agency provide?  Which agency personnel provided it?  In a word, the administrative record is barren of any data, research or, indeed, *any* evidence remotely supporting a targeted rulemaking that burdens one industry, but no others, with respect to a patent license transaction never before identified as likely to be anticompetitive by the agency.

Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") timely filed written comments making substantial objections to the proposed Rule and opposing its adoption.  *See generally* Exh. B.   In brief, PhRMA explained that imposing pre-merger notification burdens for a particular transaction on one industry, but not others, violated the HSR Act's mandate to apply such burdens even-handedly on every "person," not selectively on only those whom the enforcement agencies may disfavor.  *Id.* at 3–6.  PhRMA also stated that the proposed Rule violated the APA because the Commission failed to provide a reasoned basis, supported by credible evidence, for targeting only the pharmaceutical industry.  *Id.* at 8.  In furtherance of this point, PhRMA observed that the proposed Rule arbitrarily singled out the pharmaceutical industry in connection with patent licenses that exist in multiple industries.  *Id.* at 9.  With respect to the added burden imposed, PhRMA pointed out that the Rule would result in a material increase in the number of HSR filings from pharmaceutical companies, with substantial associated expense, uncertainty, and transaction delay.  *Id.* at 13–15.

PhRMA also commented that the FTC's reliance on unsupported claims of agency "expertise" violated the APA, and observed that the NPR did not cite *a single patent license of the type to be covered by the new Rule* that the antitrust agencies had challenged or tried to unwind because it was regarded as likely to be anticompetitive.  *Id.* at 7–8.  PhRMA attached to its comments a sworn study from an expert economist who analyzed thousands of licensing transactions in a wide range of industries, including the chemical, electronics, and medical device industries, and concluded that patent licenses of the sort targeted by the Rule are common in many industries and are not unique to the pharmaceutical industry.  *Id.* at 17–48.

PhRMA repeated its objections and opposition in separate meetings with each of the FTC Commissioners.   Exh. C (437:16 C.F.R. § 801 Summaries of Communications, *available at*

http://www.ftc.gov/policy/public-comments/initiative-437).   In addition to PhRMA, two other parties submitted written comments.  Exh. E, F.

On November 6, 2013, the FTC issued the final Rule as proposed.  It was published in the Federal Register on November 15, 2013, and became effective on December 16, 2013.  Exh. D-1 (78 FED. REG. 68705).  As the Commission had proposed in its NPR, the final Rule singles out pharmaceutical companies and saddles them with additional notification burdens when they seek to enter into patent licensing transactions that, on the one hand, grant the licensee a right to use and commercialize a patent in a specific therapeutic area or for a specific indication within a therapeutic area, while, on the other hand, allowing the patent holder to retain the right to manufacture the patented product, or to conduct a wide range of development and commercialization activities ("co-rights") for the product in the licensed therapeutic area.  *Id.* at 6.

The FTC acknowledged that licenses with retained manufacturing rights had never before been reportable "under PNO staff's prior approach."  *Id.*; *see also* Answer ¶¶ 2, 52.  The Statement of Basis and Purpose accompanying the final Rule addressed PhRMA's comments only summarily, offering little more than that the Commission viewed the Rule as an appropriate exercise of its rulemaking authority and believed it had complied with the APA.  Notwithstanding that neither the pharmaceutical industry, nor any other industry, had previously been required to file pre-merger notifications in connection with the subject patent license transactions, the Commission insisted it was not "expanding the HSR requirements to parties or transactions not covered by the Act."  Exh. D-5.   Instead, it claimed that it was "simply clarifying" that it now considered these types of licenses to be reportable when the licensor and licensee are members of the pharmaceutical industry.  The Commission proclaimed that it

8

possessed "broad authority," unlimited by anything in the HSR Act, to issue rules to facilitate the review of large transactions.  *Id.*

The FTC offered no data or analysis indicating that the Rule was "necessary and appropriate" to achieve the Act's purposes.  The Commission  acknowledges that it did not identify *even one* transaction of the type the Rule targets that either antitrust agency has ever investigated, challenged, or unwound.  Answer ¶ 62 (admitting that, in issuing the final Rule, the FTC "did not discuss particular instances in which a transaction of the type covered by the Rule has been the subject of an antitrust enforcement action").  This is the case despite the fact that the FTC and the Justice Department have authority to investigate non-reportable transactions, and could have challenged the targeted licenses even before the Rule became effective if the agencies had regarded them as likely anticompetitive.  *See* 15 U.S.C. §§ 18 (§ 7 of the Clayton Act, making anticompetitive acquisitions illegal), 21 (§ 11 of the Clayton Act, giving agencies authority to enforce § 7).  Nowhere does the FTC deny having this investigatory power.  In fact, the Commission publicizes—and routinely exercises—that authority. *See, e.g.*, FTC Bureau of Competition Director Debbie Feinstein, "Un-consummated merger" (Dec. 18, 2013), *available at* www.ftc.gov/news-events/blogs/competition-matters/2013/12/un-consummated-merger ("The commission can and will investigate consummated mergers, and when appropriate, will require divestitures to remedy the effects of a transaction that substantially lessens competition."); FTC Commissioner J. Thomas Rosch, "Consummated Merger Challenges – The Past is Never Dead" at 2 (March 29, 2012), *available at* http://www.ftc.gov/public-statements/2012/03/consummated-merger-challenges-past-never-dead (describing eighteen such challenges during the George W. Bush administration and nine additional challenges since

March 2009).  Yet the record is stunningly silent as to any instance in which it has ever seen fit to use that authority with respect to any patent license arrangement, exclusive or otherwise.

Nor did the FTC provide any empirical evidence demonstrating that the patent licenses in question were unique to the pharmaceutical industry.  In fact, distancing itself from that claimed justification in the NPR, Exh. A-3 ("because, in the PNO staff's experience, these arrangements have been limited to the pharmaceutical industry, the Commission has limited the proposed rule"), the Commission grudgingly acknowledged that "it is possible" these types of licenses are used in other industries and that "[t]here are many kinds of exclusive licensing agreements in other industries that involve the retention of manufacturing rights." Exh. D-4.  Yet the FTC continued to hide behind the PNO staff's alleged institutional "experience"—"experience" without a face, timeframe, or other identifying or descriptive particulars—for the proposition that the targeted transactions typically occur in the pharmaceutical industry.  Confronted with PhRMA's evidence and expert analysis showing that these types of patent licenses are commonplace in many industries, the Commission simply dismissed analogous licenses in other industries as "not the kinds of exclusive patent licenses covered by the final rule"—a stunning bit of circularity.  *Id.* at 5.

In promulgating the Rule, the FTC suggested two possible bases of its statutory authority: first, the Commission's ability "to define terms *used in the Act*"—although the terms the Rule defines ("all commercially significant rights," "limited manufacturing rights," and "co-rights") do not appear in the Act—and second, its authorization to prescribe other rules as may be "necessary and appropriate to carry out the purposes of" the Act.  *Id.* (emphasis added).

## III.    The Impact of the Rule

The Commission estimates that the Rule will require PhRMA's members and others in the pharmaceutical industry to notify an additional 30 transactions yearly to the antitrust

agencies, at a cost of more than $1,000,000 each year.  Exh. A-4; Exh. D-8; Answer ¶ 79. PhRMA's comments in opposition to the NPR took issue with this number as badly understated, and pointed out that the true costs will likely be substantially higher.  Exh. B-13–15.  PhRMA members enter into numerous patent license arrangements each year, with almost infinite variation in terms, many of which would likely be covered by the new Rule.  The consequence will be increased delays, risks, and expense not only for the dozens and dozens of HSR filings the Commission estimates its Rule will demand, but also for the many additional licenses that will require legal and economic analysis to determine whether they fall within the Rule.

Even under the Commission's modest estimate of 30 additional filings, the additional expense PhRMA members and others in the pharmaceutical industry will bear will be enormous. All HSR filings require a filing fee; the amount depends on the fair market value of the transaction, as determined by the filing parties.  The filing fee alone for transactions between $75.9 million and $151.7 million is $45,000, for transactions between $151.7 million and $758.6 million is $125,000, and for transactions in excess of $758.6 million is $280,000.[3]  Thus, the FTC's estimate of 30 additional filings a year would impose on the industry in the aggregate a minimum of $1,350,000 in filing fees each year and the fees could range up to an aggregate of $8,400,000 yearly.  Answer ¶ 82; Exh. B-14.  Figures at the higher end of that yearly aggregate are likely because, as the FTC acknowledges, pharmaceutical licensing transactions tend to "incur[] a filing fee at the higher end" of this range.  Answer ¶ 82.

Further, as PhRMA's comments explained, all parties incur significant costs associated with preparing the HSR notification form, which would be required from both the licensor and

---

[3] *See* PNO HSR Filing Fee Information, *available at* www.ftc.gov/enforcement/premerger-notification-program/filing-fee-information.  Revised thresholds are effective February 24, 2014. *See* 2014 Revised Jurisdictional Thresholds For Section 7A of the Clayton Act, 79 FED. REG. 3814.

the licensee.  Exh. B-14.  The average cost of preparing the form generally ranges between $40,000 and $60,000 for each party, with a lower cost for a straightforward transaction (of roughly $15,000 to $20,000) and a higher cost for more complex transactions (often exceeding $100,000).  *See* Exh. C-9.  The Commission estimates that roughly one-third (10) of its assumed 30 additional patent license transactions yearly will require more complex analyses.  Exh. D-8. Whatever their complexity, 30 additional notifications would require a minimum of 60 separate notification forms to be filed, *id.*, imposing an additional expense on PhRMA members and others in the pharmaceutical industry ranging on average from roughly $2,400,000 (60 forms at $40,000 each) to $3,600,000 (60 forms at $60,000 each) annually.

In addition, any transactions that receive a second request from the antitrust agencies typically force the companies involved to incur substantial additional fees for legal and economic analysis.  Exh. B-14.  The FTC's own analysis shows that 2.5 to 5 percent of all transactions receive second requests,  Compl. ¶ 84; *see* Hart-Scott-Rodino Annual Report, Fiscal Year 2012, at 6, *available at* http://www.ftc.gov/sites/default/files/documents/ reports_annual/ 35th-report-fy2012/130430hsrreport_0.pdf, and as of the most recent information available during the notice-and-comment period, second requests were issued in 8 percent of reportable transactions in the chemical (including pharmaceutical) manufacturing industries.  Exh. B-14.  Thus, PhRMA members and others in the pharmaceutical industry can anticipate facing several second requests as a result of the Rule.  *Id.* at 14–15.  The American Bar Association estimates that compliance with a second  request on average costs about $5 million per transaction and up to $20 million in very complex cases.  *Id.* at 14.

Furthermore, because HSR–reportable transactions are subject to an initial mandatory waiting period, and the FTC and Justice Department have discretion to extend that period to

conduct further investigation, the Rule will introduce considerable delay and uncertainty for previously unreportable pharmaceutical licensing transactions.  PhRMA members and others in the pharmaceutical industry will no longer be able to quickly consummate licenses designed to get needed beneficial medicines to market, and the delay will be substantially magnified when the agencies issue a second request.

## IV.    Plaintiff's Challenge

On December 16, 2013, PhRMA filed a four-count complaint with this Court seeking declaratory and injunctive relief.  Count One challenges the Rule as unauthorized agency action under the HSR Act.  Compl. ¶¶ 63–68, 90–93.  Count Two challenges the Rule as arbitrary, capricious and an abuse of discretion in violation of the APA.  *Id.* at ¶¶ 69–78, 95–100.  Count Three contends that the FTC failed to provide interested persons a sufficient opportunity to meaningfully participate in the rulemaking.  *Id.* at ¶¶ 102–105.  Count Four claims that there is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of PhRMA's members to warrant relief under 28 U.S.C. § 2201.  *Id.* at ¶¶ 108–109.

The Complaint asks that the Rule be declared unlawful and void; that it be vacated and set aside; that the FTC and its officers, agents, employees, and successors, and all persons acting in concert or participating with the FTC, be permanently enjoined and restrained from enforcing, applying, or implementing the Rule; that PhRMA be awarded its costs of litigation, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 2412; and that the Court grant PhRMA such other relief as  it deems just and proper.

On February 3, 2014, the FTC filed an answer, admitting PhRMA's standing to bring this challenge, Answer ¶ 13, but denying essentially all allegations material to Plaintiff's claims that the Rule violated the HSR Act and the APA.

**STANDARD OF REVIEW**

Summary judgment is "an appropriate procedure for resolving a challenge to a federal agency's administrative decision" when, as here, "review is based upon the administrative record." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C. 1995) (citing *Richards v. INS*, 554 F.2d 1173, 1177 n.228 (D.C. Cir. 1977)). In an agency challenge, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 32 (D.D.C. 2010) (internal quotation marks omitted). The district court's role is to "review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings are based on substantial evidence." *Forsyth Mem'l Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011). As this Court has recognized, "when an agency action is challenged, the entire case on review is a question of law, and only a question of law." *ICI v. CFTC*, 891 F. Supp. 2d 162, 186 (D.D.C. 2013) (as amended), quoting *Marshall County Healthcare Auth. v. Shalala*, 988 F.3d 1221, 1226 (D.C. Cir. 1993).

Claims that regulations are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), are reviewed under the *Chevron* framework. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, "if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent." *Ass'n of Private Sector Colleges and Universities v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012). To make this assessment, courts "employ[] traditional tools of statutory construction," *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007), by examining "the statutory text at issue, the statute as a whole, and . . . legislative history where appropriate." *Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading*

14

*Comm'n,* 887 F.Supp.2d 259, 268 (D.D.C. 2012).  If this review makes plain that Congress did not intend to delegate to the agency the authority it claims to have exercised, the resulting agency action is "unlawful" and must be "set aside." 5 U.S.C. § 706(C).

In addition, the APA instructs courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious when, among other things, the agency "entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before the agency." *Am. Petroleum Instit. v. EPA*, 684 F.3d 1342, 1350 (D.C. Cir. 2012). The record must disclose a reasoned basis for the agency's decisionmaking. *See, e.g.*, *Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012).  No deference is due to an agency action based on its "purported expertise." *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006).  "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  An agency's decision may not be affirmed "on a ground other than that relied upon by the agency" in its rulemaking. *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

The APA also requires that a reviewing court "hold unlawful and set aside" agency action "found to be without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  One of those required procedures is that, in conducting notice-and-comment rulemaking, an agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).

**ARGUMENT**

**I.     The Rule Exceeds the Scope of the FTC's Delegated Authority under the HSR Act.**

The Rule fails for the most rudimentary of reasons: the HSR Act plainly does not allow the FTC to expand the scope of the pre-merger reporting requirements on a piecemeal basis that burdens one industry while leaving all others unaffected.  When Congress enacted the HSR Act, it affirmatively elected not to include language that would have permitted the agency to impose reporting burdens unequally on persons or industries otherwise similarly situated.  The new Rule, obliging the pharmaceutical industry alone to pre-file on patent license transactions that are commonplace and used no differently in other industries, goes well beyond what the FTC is authorized to do as an exercise of its rulemaking responsibility.  It is therefore invalid.

The terms of the HSR Act make plain that, as a general matter, the notification requirements are to be applied across-the-board to every "person" who is party to a transaction that meets the Act's thresholds.  The Act explicitly states that the *only* exception to its generally applicable coverage is for certain *exemptions* for specific and limited "classes" of transactions or persons, some of which are defined in the statute and others of which the FTC has the authority to create by regulation when it determines those classes of transactions are "not likely to violate the antitrust laws."  15 U.S.C. §§ 18a(a) ("*Except as exempted* pursuant to subsection (c) of this section, *no person*" who meets the statutorily defined thresholds "shall acquire, directly or indirectly, any voting securities or assets of any other person, unless both persons" comply with the Act's notification requirements); 18(d)(2)(B).  Subsection (c) exempts eleven enumerated "classes of transactions," as well as "such other acquisitions, transfers, or transactions, as may be exempted under subsection (d)(2)(B)."  15 U.S.C. § 18a(c).  Subsection (d)(2)(B) permits the FTC to exempt from the Act "classes of persons, acquisitions, transfers, or transactions which are not likely to violate the antitrust laws."

The exemption power in subsection (d)(2)(B) is narrowly drawn, authorizing the agency *to relieve* certain classes of persons or transactions *unlikely to violate the antitrust laws* from pre-closing notification burdens that are otherwise to be imposed indiscriminately.  This authority has nowhere been understood or treated as permitting the FTC to *impose* notification burdens for a class of transactions on only certain classes of persons.  The challenged Rule nonetheless does just that.  It does not *relieve* a discrete few who pose no apparent antitrust concern from the burdens imposed on all others.  (Nor, of course, does the Commission claim that the Rule is an exemption or purport to be exercising such authority.)  Instead, the Rule *imposes new burdens* selectively on a targeted class of persons (*i.e.,* those in the pharmaceutical industry only) in connection with patent license transactions suddenly now regarded by the agency as likely anticompetitive.  Yet those same suspect transactions, if used by parties similarly situated in every respect save for their industry affiliation, are inexplicably not reportable.  This sort of uneven treatment of persons similarly situated with respect to like transactions exceeds the FTC's rulemaking authority and cannot be permitted to stand.

The Act's legislative history confirms that Congress did not intend to give the FTC authority to extend the Act's coverage on such selective terms.  While the legislation was under consideration in the Senate, language was explicitly included in the Senate bill that would have allowed the FTC, after consulting with the Justice Department, "to require pre-merger notifications from particular companies or industries or from any class or category of persons." *See* 122 Cong. Rec. 29342 (Sept. 8, 1976) (referring to S. 1284 (May 6, 1976)) (cited in Exh. B-3 & n.3).  The intended effect of the Senate bill was to give the antitrust agencies authority to *impose reporting burdens* on certain "classes or categories" of persons with respect to the same

17

proposed transactions that would not be reportable by others whom the antitrust agencies chose to treat more favorably.  See S. 1284 (May 6, 1976) (cited in Exh. B. at 3 & n.3).

The House deliberately removed that provision, and it was not included in the final version of the bill that became the HSR Act.  Explaining that decision, Rep. Peter W. Rodino (one of the Act's sponsors as well as the then–Chairman of the House Judiciary Committee) stated that "[i]n the view of the House conferees, the coverage of this bill should be decided by Congress—not the FTC and the Justice Department."  *See* 122 CONG. REC. 30877 (Sept. 16, 1976) (cited in Exh. B-3 & n.3).

It is thus clear that the Act authorizes the FTC to impose pre-merger notification requirements for like transactions only uniformly and even-handedly, not by selectively burdening some with reporting obligations while leaving others unaffected.  Indeed, the FTC has always recognized this limitation on its authority.  In the Commission's numerous rulemakings over the 37–year history of the HSR Act, it has *never once*, until now, issued an industry-specific coverage rule.  Thus, the FTC's attempt to spin the Rule as a mere "clarification" of prior practice, Exh. D-4, cannot pass even the most basic credibility test.  In reality, the agency action taken here is not a clarification, but simply put, an impermissible aberration.

As the Act itself expressly commands, the FTC is to exercise its rulemaking authority only in a manner "consistent with the purposes of this section."  15 U.S.C. § 18a(d).  When "a statute of general applicability directs that certain procedures must be followed, an agency cannot modify or balance away what Congress has required of it."  *Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1266 (D.C. Cir. 2004).  No matter how broad an agency perceives or proclaims its delegated regulatory authority to be, "it may not impose requirements that contravene express statutory mandates."  *Verizon v. FCC*, No. 11-1355, __ F.3d __, 2014 WL

113946, at *1 (D.C. Cir. Jan. 14, 2014).  A regulation targeting only one industry with new and onerous reporting requirements for like patent license transactions prevalent in many other untargeted industries hardly complies with the HSR Act's grant to the FTC of authority exercisable *only* uniformly and even-handedly as to all similarly situated "persons" or "classes of persons."

Nor can the Rule gain approval as a legitimate exercise of either of the specific rulemaking powers the FTC purported to use: 1) the ability to "define the terms used in this section"; and 2) the ability to "prescribe such other rules as may be necessary and appropriate to carry out the purposes of the section."  15 U.S.C. § 18a(d)(2)(A)–(C).[4]  Neither of those specific powers is the least bit relevant to this rulemaking, and neither provides the agency with authority to promulgate the Rule.

*First*, the FTC cannot use its authority to define the Act's terms to circumvent the statute's overarching requirement that pre-merger notification regulations as to like transactions are to apply uniformly to all "persons."  It is well settled that an agency cannot "use its definitional authority to expand its own jurisdiction" under the underlying statute.  *Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 755 (D.C. Cir. 1995) (invalidating SEC rule purportedly based on agency's definitional power because definition was not "consistent with" the enabling statute). Were it otherwise, agencies could define terms so as to make their powers limitless.  *See Comcast v. FCC*, 600 F.3d 642, 655 (D.C. Cir. 2010) (rejecting FCC's conception of its authority that "would virtually free the Commission from its congressional tether"); *Am. Civil Liberties*

---

[4] The Act also provides that the FTC "shall" follow the APA's informal rulemaking procedures under 5 U.S.C. § 553 to create rules and forms implementing the Act.  15 U.S.C. § 18a(d)(1). Although the FTC referred to this provision generally, the Statement of Basis and Purpose accompanying the final Rule does not even purport to claim the Rule is an exercise of that power.

*Union v. FCC*, 823 F.2d 1554, 1567 n.32 (D.C. Cir. 1987) ("[I]t seems highly unlikely that a responsible Congress would implicitly delegate to an agency the power to define the scope of its own power."); *cf. Whitman v. American Trucking Ass'n, Inc.*, 531 U.S 457, 472–73 (2001) (discussing the nondelegation doctrine).   Here, as in *American Bankers Association*, Congress expressly declared that the definitional rules must be "consistent with the purposes" of the statute. 15 U.S.C. § 18a(d)(2)(A).   A Rule that defines terms in order to impose on members of one industry alone, but on no others, notification burdens for what the agency declares as potentially anticompetitive transactions that require pre-closing notifications—transactions that unquestionably occur in multiple industries—is decidedly not consistent with the Act's purposes.

Moreover, even though Congress delegated the agency the authority to define only terms "used in this section," 15 U.S.C. § 18a(d)(2), the Rule purports to add entirely new defined terms that *do not* appear in the Act.   The Commission freely acknowledges this, proclaiming that the Rule creates, "defines and applies the concepts of 'all commercially significant rights,' 'limited manufacturing rights,' and 'co-rights,'" Exh. D-1, and including these new terms in the "definitions" section of its regulations, 16 C.F.R. § 801.1(o)–(q).   But in the course of its rulemaking, the FTC did not even attempt to justify this blatant abuse of its delegated authority to define terms *in the Act*.   Instead, it responded to PhRMA's comments noting this fundamental flaw with the Rule by asserting, without further elaboration, that the ability to define terms "allows it to determine which types of patent rights constitute reportable assets under the Act." Exh. D-5.   But Congress did not imbue the circumscribed ability to define the HSR Act's terms with such  expansive authority.   The FTC is unable to point to any statutory text—because none exists—giving it the limitless power to define *any* terms, whether or not they appear in the Act.

*Second*, the FTC proposes that the Rule is valid as an exercise of its authority to create ancillary rules that are "necessary and appropriate" to carrying out the Act's purposes.  Exh. D-4. This ignores the perennial truth that Congress "does not . . . hide elephants in mouseholes." *Whitman*, 531 U.S. at 468; *see Bilski v. Kappos*, 130 S. Ct. 3218, 3250 (2010).  Courts thus presume that Congress did not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."  *Whitman*, 531 U.S. at 468.

The "necessary and appropriate" clause in the HSR Act is just such an ancillary provision.  And nothing in the statute, its legislative history, applicable case law, or agency practice even hints that Congress considered it either "necessary" or "appropriate" to the HSR Act's purposes to provide the FTC with unfettered authority to saddle targeted industries with onerous reporting obligations before they can enter into certain patent license agreements deemed for the first time by the agency to raise antitrust concerns, while refraining from imposing similar obligations on all others before they enter into the same licensing arrangements. *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 704 (D.C. Cir. 2005).  To the contrary, Congress specifically elected to reserve for itself any such uneven coverage decisions.  *See* discussion *infra* at 17–18.  And the FTC has offered no facts suggesting why it is, in this instance, either necessary or appropriate to ignore that legislative decision.  That is unsurprising, given that there is no evidence that the FTC has ever before regarded these licenses as reportable or as potentially anticompetitive, and no evidence that it would be difficult to unscramble such a license.[5]

The FTC has no support for its throwaway suggestion that this Rule is "necessary," arguing only that the Rule serves the Act's purpose "to ensure that large transactions are reported."  Exh. D-5.  If that were truly the agency's objective, would not the Rule oblige *all*

---

[5] *See infra* note 7.

persons who propose to use such ostensibly "large" patent transactions to adhere to the pre-merger notification requirements?  Moreover, at the very least, one would expect the agency record to contain some evidence that the newly covered transactions—in the pharmaceutical industry, if not elsewhere—had recently become antitrust-sensitive and the filing requirement was thus "necessary" to avert potential anticompetitive effects (and presumably that could not be readily unwound).  But the FTC has made no such evidentiary showing, and nowhere is there mention of even a single transaction of the type at issue here that either the FTC or Justice Department has ever challenged as possibly anticompetitive or sought to unwind for antitrust reasons after the fact.[6]  Even as it was fashioning the Rule, the FTC inexplicably did not find it necessary to include these very transactions under its pre-merger scrutiny umbrella if they were to be conducted outside the pharmaceutical industry.  Exh. D-2.  That the Commission believes these patent transactions do not warrant pre-merger review in most sectors of the economy speaks volumes to their truly benign antitrust nature.  This disproves any "need" for the Rule and, given the senseless delays and multimillion dollar costs the Rule will impose, affirmatively demonstrates that it is not "appropriate."

Because the Rule is unauthorized agency action, it must be declared unlawful and vacated.

---

[6]  This would suggest as well that the Rule was never considered "necessary" to another of the HSR Act's principal purposes: "reducing the problem of unscrambling the assets after  [an anticompetitive] transaction has taken place." 52 FED. REG. 20059 (1987).  Of course, if patent license transactions of the sort involved here are regarded as posing no imminent antitrust threat, as has long been the case, there is no credible reason for an "unscrambling" concern.  The undeniable fact is that the kinds of patent licensing transactions reached by the new Rule do not entail irreversible integration between the parties or an irretrievable mingling of assets.  The licensor continues to function as an independent entity, in many cases owning and operating the manufacturing capacity and expertise for the patented product, as well as maintaining ownership of the intellectual property.  Manifestly, "[t]he independent identity of the acquired firm [licensor]" does not "disappear[]."  H. Rep., No. 94-1373 (cited in Exh. B-6 n.23) at 8.

## II.     The Rulemaking Was Arbitrary and Capricious.

In addition to being an overreach of the Commission's authority, the Rule cannot survive because the rulemaking rested only on unsupported, vague and conclusory justifications that were contradicted by the only record evidence, which the Commission chose to largely ignore. The result of the FTC's flawed rulemaking is an unjustified and unjustifiable Rule.   The rulemaking was arbitrary and capricious under the APA, requiring that the Rule be held unlawful and set aside.  5 U.S.C. § 706(2)(A).

### A.     The Rule Was Not the Product of Reasoned Decisionmaking.

A rule is invalid if the agency's explanation for promulgating it is insufficient to enable a court to conclude that the decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  "Factual determinations that underly regulations must still be premised on demonstrated—and reasonable—evidential support." *Verizon*, 2014 WL 113946, at *33 (Silberman, J., concurring in part and dissenting in part) (citing *State Farm*, 463 U.S. at 43).  Here, the record belies reasoned decisionmaking and reveals that the FTC conducted *no* rational empirical analysis of the issue whatsoever.

In both the NPR and Statement of Basis and Purpose accompanying the final Rule, the FTC proffered as justification for the Rule only the agency's own institutional "experience."  But it furnished no insight into the nature, extent, or other particulars of that claimed "experience."  It is settled law that vague and unembellished references to agency "experience" that leave one only to guess how, under what circumstances, and under the tutelage of which individuals that alleged "experience" may have been derived, fall far short of a sufficient explanation under the APA.  Courts "owe no deference to the agency's purported expertise" when the "agency's explanation for its determination lacks any coherence." *Coburn v. McHugh*, 679 F.3d 924, 926

23

(D.C. Cir. 2012) (citation omitted).  Lacking a reasoned analysis justified by objective evidence, rather than a mere mouthing of administrative "expertise," the rulemaking does not meet APA standards.  *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1189 (D.C. Cir. 1990) ("conclusory statements" are insufficient to satisfy APA); s*ee also Tripoli Rocketry Ass'n*, 437 F.3d at 83 (agency action violated APA because it was "founded on unsupported assertions" and references to "institutional expertise," which is not "a licence [sic] for making unarticulated findings").

The FTC chose to rest on the claim that "[t]he PNO has not found other industries that rely on these types of arrangements."  Exh. D-4.  But as the record reflects, the PNO never maintained that it had *looked* for other industries relying on similar arrangements.  There is, however, abundant record evidence showing that, had the agency done any sort of investigation, it would have readily found patent license arrangements similar to those covered by the Rule being used in multiple industries.  *See* discussion *infra* at 25.  Unsupported assertions— particularly those disproved by credible evidence that was available to, but disregarded by, the agency—are no substitute for the reasoned analysis required by the APA.  *See Am. Equity Invest. Life Ins. Co. v. SEC*, 613 F.3d 166, 177 (D.C. Cir. 2010) (vacating rule as arbitrary and capricious because "[t]he SEC purports to have analyzed the effect of the rule on competition, but does not disclose a reasoned basis for its conclusion that [the rule] would increase competition"); *Tripoli Rocketry Ass'n*, 437 F.3d at 77 (refusing to defer to agency's reliance on purported expertise where the record did not reveal the basis for its assertions).

## B.    The FTC's Explanation Is Contrary to the Only Record Evidence.

It hardly need be stated that agency action is arbitrary and capricious when the agency "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.  Here, the FTC's explanation for the Rule rested solely on its misguided claim that the targeted licensing arrangements are unique to the pharmaceutical

industry.  Exh. D. at 4.  Faced with a comprehensive report showing otherwise, the Commission even acknowledged, albeit grudgingly, that "there are many kinds of exclusive license agreements in other industries that involve the retention of manufacturing rights" and allowed that "it is possible" these precise types of licenses are used elsewhere.  *Id.*

But the record shows that it is more than "possible"—it is the reality.  These types of patent license agreements are used, in one form or another, in a number of other industries.  During the rulemaking, PhRMA provided with its comments to the FTC a studied report of Dr. Thomas Varner, an economist who analyzed the use of intellectual property licenses.  Dr. Varner collected and reviewed thousands of technology licenses filed by SEC registrants.  Exh. B-18, 25.  His report details his findings, which readily affirm that the patent licenses covered by the Rule are prevalent in a variety of other fields, including the chemical, electronics, and medical device industries.  *Id.* at 20–27, 30–32 (providing specific examples).  He concluded that these types of licensing transactions in the pharmaceutical industry are functionally no different from licensing transactions in a number of other industries.  *Id.* at 19.  His findings also revealed that the incentives to enter into such arrangements are not unique to the pharmaceutical industry, but can be found across numerous other industries in which such similar arrangements are used.  *Id.* at 27–29.  Dr. Varner's record evidence, replete with specific examples he reviewed, stands in stark contrast to the agency's pretextual justification for singling out the pharmaceutical industry under its new Rule.  Such disregard for record evidence is precisely what the APA forbids.

### C.   The Commission Failed to Respond to the Rulemaking's "Substantial Problem" PhRMA Raised in its Comments.

The FTC further violated the APA by failing to offer a meaningful response to Dr. Varner's report.  Before promulgating a rule, an agency must respond to "substantial problems raised by commenters."  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1149 (D.C. Cir. 2011)

(vacating rule because agency had failed to do so).  Moreover, when a commenter's objection, if true, "would require a change in the proposed rule," an agency response is mandatory.  *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003).  And the "failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious."  *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011).

The FTC noted that it "does not disagree"—as, indeed, it could not—with Dr. Varner's extensive data demonstrating that patent license agreements in a variety of industries involve the transfer of use and commercial rights but retained manufacturing rights.  Exh. D-4.  It sought to avoid Dr. Varner's findings by suggesting—with no supporting evidence or reasoning—that there was a difference between the "other industry" transactions covered in Dr. Varner's report and those transactions used in the pharmaceutical industry that are covered by the Rule.  *Id.*

But to simply claim there is a difference does not make it so.  The essential fact is that, in both instances, the patent licensor transfers rights to use and commercialize a patent (or part of a patent) while retaining all manufacturing rights.  The governing patent and contract laws are the same whether rights are transferred in the pharmaceutical or any other industry.  Whether the transfer of commercial and use rights to the licensee is comprehensive, or is something less, retention of manufacturing rights by the licensor ensures that both parties remain separately engaged in the marketplace.  The commercial side of the arrangement is controlled by the licensee; the manufacturing end is controlled by the licensor.  There is no mingling of assets under any such patent licenses.

Whatever perceived antitrust implications might likely reside in such arrangements—and the agencies have never claimed to have observed any—they hardly differ (if at all) from one patent license to another, since all have essentially the same business structure and the parties

26

involved operate similarly as licensor and licensee.  Nor is there any restriction anywhere on industry use of such arrangements as exclusive patent licenses (transferring all use and commercial rights to the licensee while retaining manufacturing rights) as opposed to licensing only some use and commercial rights, retaining others, and retaining all manufacturing rights. Persons in any industry are free to do either, neither, or both, and as the administrative record shows, they clearly do.  Yet the Rule imposes notification burdens on pharmaceutical companies proposing to enter into such exclusive patent license transactions, but offers no reasoned explanation why parties proposing the same transaction in any other industry escape the  Rule's notification requirements.

While disowning one of the NPR's initial justifications for targeting the pharmaceutical industry—its supposedly unique incentives and unique market structure, Exh. A-3—the Commission continued to insist that the subject transactions are nonetheless unique to the pharmaceutical industry.  Exh. D-4–7.  The only support for this assertion was, as in the NPR, untested and untestable references to "the PNO's knowledge."  *Id.*  An unsupported and inexplicable allusion to the "knowledge" or "experience" of  unidentified agency personnel, or simply to institutional "knowledge" or "experience," especially in the face of evidence indicating otherwise, is not just an unsatisfactory response; it is no response at all.  With such flimsy support, the Rule must fall.  *Am. Equity,* 613 F.3d at 177 (vacating rule as arbitrary and capricious on finding that "[t]he SEC purports to have analyzed the effect of the rule on competition, but does not disclose a reasoned basis for its conclusion that [the rule] would increase competition").

**D.      The FTC Did Not Explain Why a Targeted Rule Is Necessary.**

The APA further demands that an agency clearly articulate the need for its action so as to demonstrate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).  The Rule requires specific pre-merger notifications for the stated purpose of permitting the antitrust agencies to evaluate whether those proposed transactions "may violate the antitrust laws if consummated."  Exh. D-1.  Yet the record is devoid of any suggestion that these transactions have particular antitrust implications, or that they have *ever* been found by the antitrust agencies to be potentially anticompetitive.  To the contrary, the Commission acknowledges that it chose to target the pharmaceutical industry only because it supposedly "has experience" with the relevant transactions.  Exh. D-4.

That "experience," it seems, comes solely from utterly undescribed requests the PNO has purportedly received in the past for guidance on whether exclusive patent licenses are reportable; the claim is apparently that, when the requestor identifies the industry, the pharmaceutical sector is most frequently mentioned.  *Id.*  We do not know how many requests, when they were made or by whom, or anything else about them—other than the admitted fact that the PNO apparently repeatedly informed the unknown requestors that their transactions were not reportable.  But even if the premise is assumed—and setting aside the fact that not all requests for PNO advice identify the industry involved in the request—it hardly suggests a need for the targeted Rule. Indeed, based on the record, in all the years the PNO has fielded such requests, nothing has indicated that these transactions needed to be reported, and no concerns have ever been raised, either internally or externally, that the transactions beckoned antitrust scrutiny.

The Commission claimed that the Rule should provide "clarity and consistency," Exh. D-6, but it provided no reasoned or evidence-based explanation of how the Rule would serve that

goal—let alone how the Rule was *necessary* to doing so.  Nor could it have furnished such an explanation.  To offer clarity, and certainly to ensure consistency, a rule must apply generally and require uniform regulation across *all* segments of the economy.  The agency's "experience"—from all indications antitrust-benign—"with such transactions in the pharmaceutical industry," *id.* at 5, provides no justification for imposing burdens in that sector that are not imposed on others using virtually identical exclusive patent licenses.  *See Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 167 (D.C. Cir. 2005) (vacating an agency decision due to "a lapse of reasonable and fair decisionmaking").  Thus, far from showing that the Rule is "necessary," the PNO's background "experience" counsels *against* any rule requiring that these transactions be reported, let alone a rule specifically aimed at those whose past reporting caused the agency no antitrust discomfort.

Finally, the FTC's understanding of the HSR Act and its other regulations leads inescapably to the conclusion that the Rule is *not* necessary.  The agency states that "transfers of exclusive rights to patent in other industries remain potentially reportable under the Act and existing HSR rules."  Exh. D-5.  Given that the FTC has acknowledged that there is no need for a rule targeting these types of patent licenses so long as they appear in any other industry, and has never before deemed it necessary in the pharmaceutical industry, it is clear that the Rule is not necessary to target these transactions in the pharmaceutical sector.

## III.   The Rulemaking Was "Without Observance of Procedure Required by Law."

The Rule must be set aside for yet another, independent reason: the FTC's rulemaking failed to follow the procedures the APA requires.  This is an unambiguous APA violation requiring that the Rule be vacated.  *See* 5 U.S.C. § 706(2)(D) (a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law").

29

Specifically, when an agency promulgates a rule, it "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."   5 U.S.C. § 553(c).   This requirement compels an agency to set forth in a Notice of Proposed Rulemaking the most critical factual material and reasoning on which it relied to formulate the regulation.   *E.g.*, *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (requiring that, on remand, the agency make available for notice and comment unredacted versions of staff reports it used in reaching its decision); *see also Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531–32 (D.C. Cir. 1997) (per curiam).   As the D.C. Circuit has recognized, "[i]t is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, to a critical degree, is known only to the agency." *Am. Radio*, 524 F.3d at 237 (internal quotation marks, alteration, and citation omitted).

Despite this clear requirement, the FTC did not set forth *any* factual material on which it relied in making the decision to propose the Rule.   Whether the agency would attribute the empty record to a failure to collect information ("inadequate data") or a failure to place that information on the record ("data . . . known only to the agency"), or to some of each, the result is the same: potential targets of the Rule, PhRMA and its members included, were deprived of an opportunity to assess and refute that data supporting the agency's vague assertions and conclusory remarks regarding institutional "knowledge," "experience," and "expertise."   For this independent reason, in addition to all others, the Rule violates APA requirements and must be set aside.

**CONCLUSION**

For the several reasons stated, the challenged Rule exceeds the agency's authority under the HSR Act and in multiple respects violates the APA.  Accordingly, it should be declared unlawful and vacated, and its enforcement in all respects enjoined.

Dated: February 7, 2014                    Respectfully submitted,

                                           /s/ Joseph A. Ostoyich
                                           Joseph A. Ostoyich, DC Bar # 436157
                                           joseph.ostoyich@bakerbotts.com
                                           James F. Rill, DC Bar # 52027
                                           james.rill@bakerbotts.com
                                           Wm. Bradford Reynolds, DC Bar # 179010
                                           bradford.reynolds@bakerbotts.com
                                           David Shotlander, DC Bar #975011
                                           david.shotlander@bakerbotts.com
                                           Emma M. Burnham, DC Bar # 1012126
                                           emma.burnham@bakerbotts.com
                                           BAKER BOTTS L.L.P.
                                           1299 Pennsylvania Ave., NW
                                           Washington, DC 20004-2400

                                           *Attorneys for Plaintiff*